# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| In Re: | Case No.:  19-30359 |
|---|---|
| JM Grain, Inc., | Chapter 11 |
| Debtor. | |

## DECLARATION OF JUSTIN FLATEN IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Justin Flaten, do hereby declare, under penalty of perjury, the following to the best of my knowledge, information, and belief:

1.      I am the President of JM Grain, Inc., ("**Debtor**"), a North Dakota corporation that was founded in 2001 as a general partnership and incorporated in 2004.  The Debtor's office is located in Great Falls, Montana, and a processing facility is located in Garrison, North Dakota. Since Debtor was founded and incorporated in North Dakota and the majority of its assets located in Garrison, the Debtor's headquarters has generally been considered to be in Garrison, ND with the Great Falls, MT considered an auxiliary office.

2.      I am familiar with the day-to-day operations and business and financial affairs of the Debtor, having served in this capacity for the last eighteen (18) years, and have been employed by the Debtor since 2001.

3.      On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of North Dakota (the "**Court**") under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing this Chapter 11 bankruptcy case.  The Debtor intends to operate its

business and manage its properties as debtor-in-possession and restructure its business operations.

4.      This declaration (this "**First Day Declaration**") is submitted (i) to provide an overview of the Debtor and this Chapter 11 case and (ii) in support of the Debtor's Chapter 11 petition and "first day" motions (each a "**First Day Motion**," and collectively, the "**First Day Motions**"), which have been filed to minimize the adverse effects of filing for Chapter 11 protection and enhance the Debtor's ability to maximize the value of its estate.

5.      If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge. In my capacity with the Debtor, I am familiar with the Debtor's day-to-day operations, business affairs, financial condition and books and records.  My testimony herein is based on my service as an officer of the Debtor, my review of the Debtor's books and records and other relevant documents, and my review of information compiled and communicated to me by other employees of the Debtor and the Debtor's professional advisors.

6.      Prior to the commencement of this Chapter 11 case, I:  (i) reviewed and discussed the Debtor's strategy regarding the development of potential restructuring alternatives; (ii) supervised the preparation of the documentation needed to implement this Chapter 11 case; and (iii) consulted on a regular basis with the Debtor's other management members and outside advisors with respect to the foregoing.

7.      Section I of this Declaration summarizes the Debtor's business affairs, the recent financial set-backs Debtor has encountered, and an overview of the Debtor's Chapter 11 objectives and the benefits thereof.  Section II describes the Debtor's business history, corporate structure, governance model and prepetition indebtedness.  Section III further details

the Debtor's objectives for this Chapter 11 case and the contemplated means by which such objectives will be met.  Finally, Section IV sets forth the relevant facts in support of the First Day Motions and summarizes the relief requested thereby.

**I.    SUMMARY AND OVERVIEW**

8.      The Debtor's primary business consists of buying, processing and selling pulse crops in the pulse producing regions of North Dakota and Montana.  The pulse crops grown in the region are pea, lentil, chickpea and dry beans.  JM Grain, Inc. was established by Justin and Marvin Flaten in 2001. In 2003, a processing plant was opened in Garrison to serve the quickly expanding pulse market in North Dakota.  In 2010, an office was opened in Great Falls, Montana, as an opportunity to participate in the region's expanding pulse production.  In 2015, JM Grain, Inc. added toll processors (*i.e.*, service provider that clean, sorts, and packages pulses) at Pardue, Montana, and Cummings, North Dakota, to its scope of business.  The toll processers greatly expanded JM Grain's capacity from one plant into three, and diversified freight and logistics.

9.      After 16 years of growth and sustainable business, Debtor experienced severe financial setbacks in fiscal years 2017 and 2018 and year to date 2019 due to the following:

a.      Debtor's robust growth in fiscal years 2015 and 2016 created both greater opportunities and exposure.  Annual sales increased by 6 million from 2014 vs. 2015 and 9 million from 2015 vs. 2016.  JM Grain continued with an equal pace of business in fiscal year 2017 by aggressively participating in chickpea markets.  Debtor contracted chickpeas with growers in the fall and winter of 2016 /2017 and sold that contracted production with a ship period after harvest 2017.  Debtor offered an "act of God" clause which allowed growers to under deliver or not deliver if weather events

3

prohibited production of the contracted quantity. JM Grain sold 80% of the contracted quantities to its customers. From historical experience, JM Grain determined the 20% factor for weather fails was a sufficient hedge to ensure production quantities would meet sales quantities. Unfortunately, 2017 proved to be a historical year for drought. Many areas across Montana and North Dakota experienced the driest year on record. JM Grain received only 55% of the contracted quantity of chickpeas as a result of the extreme growing conditions. Due to the drought and strong demand, the short supply market rallied the price. The market quickly increased to record levels after harvest with grower bids reaching $.50/lbs. Because of insufficient deliveries of contracted production, Debtor covered sales with spot purchases paying $.10/lb. to $ .20/lb. higher than the contracted price. The higher than forecasted cost of chickpeas squeezed margins for JM Grain in 2017.

b.      To further compound the problems created by the drought, in November and December of 2017, India, the world's largest importer of pulses, placed tariffs on chickpeas, peas, and lentils of 44%, 33%, and 50%. India's market share of pulse crops is historically 35% to 50% of the world's annual export volume. The USA market is dependent on exports -- about 75% annually of US pulse production is exported. Debtor's sales mirror the industry with about 75% of sales being exports. With the world's largest market essentially closed because of high tariffs, the pulse markets have dramatically changed. Since the fall of 2017, chickpea prices dropped 70%, lentils have dropped 55%, and peas have been lowered by 30%. Additionally, the second and third largest markets for US pulses, China and the EU, have placed tariffs of 25% on US origin pulses effectively shutting down those markets. The closing of the three

4

largest markets has been devastating.  Debtor was caught with large inventories of chickpeas and lentils at the start of 2018 with nowhere to sell, and sustained heavy losses in 2018 as the inventory was liquidated.  Debtor also experienced defaults on contracts from foreign buyers in India, Dubai, Sri Lanka, and Canada resulting in non-payments on shipments totaling $1.643 million as well as defaults from farmers that did not provide proof of loss for their undelivered contracted amount of $700,000.

      c.     Finally Debtor, as an approved USDA vender since 2004, participates in food aid tenders from the USDA.  Historically Debtor has had much success in these sales.  The USDA is Debtor's single biggest customer/ buyer.  For fiscal year 2019 (October 1, 2018 through current), the USDA has purchased only 25% of its normal pulses crop purchases.  The reduced USDA purchase volume has left Debtor struggling to cover fixed costs at the Garrison plant.  Although gross margins have recovered somewhat (to percentages where Debtor was historically profitable) for fiscal year 2019, the USDA's lack of interest combined with loss of the high volume markets of India, China and the EU have forced the Debtor to struggle to create enough sales to cover fixed costs. Year to date sales total 3.5 million, whereas normal operations would have generated 13 million is sales year to date.

10.     The combination of the above-detailed unforeseen events has resulted in losses for Debtor.  The Debtor determined, upon consultation between its owners and management, that this Chapter 11 case provided the best opportunity to maximize value for the Debtor's estate for the benefit of its creditors and all interested parties, through reorganization and restructuring its business affairs.

5

11.    Debtor's plan for restructuring includes additional investment by the shareholders. The shareholders anticipate investing up to an additional $1.5M to pay down and/or term out the operating line of credit. Additionally, the Debtor has reduced administrative staff and salaries and has put back into service two semi-trailers that were not being utilized that will reduce monthly transportation costs by an estimated $10,000 per month. Debtor is also expanding its service provider business with an emphasis on processing and logistics services and reducing its purchases from farmers.

## II.    BUSINESS HISTORY, CORPORATE STRUCTURE, AND PREPETITION INDEBTEDNESS

### A.    *Overview of Debtor's Business and History*

12.    The Debtor is privately owned and buys, processes and sells pulse crops in the pulse producing regions of North Dakota and Montana.

13.    The Debtor is an S-Corporation.  Justin Flaten and Marvin Flaten are each 50% owners of the stock in Debtor.

14.    Debtor's year-end for tax purposes for 2019 will be December 31, 2019. Debtor's fiscal year end will be December 31, 2019.  Debtor files an 1120S tax return annually.

15.    Debtor has ten (10) full-time employees as of the Petition Date that work in the Garrison, ND and Great Falls, MT plant and office locations.

16.    The Debtor's total sales in the 12 months ending December 2018 were approximately $10,500,000.

### B.    *Prepetition Indebtedness*

17.    The Debtor's prepetition debt structure primarily consists of:  (i) First Western Secured Debt (defined below); (ii) Receiptholders (defined below); (iii) FBN CM LLC

Unsecured Debt (defined below); and (iv) other unsecured debt consisting of, among other things, employee-related liabilities and trade debt, including amounts owed to farmers in connection with certain pulse contracts.

<em>(i)</em>     <u><em>First Western Secured Debt</em></u>

18.     On March 10, 2016, Debtor as Borrower and First Western Bank & Trust ("First Western") as Lender entered into an Line of Credit Agreement (the "**First Western LOC**") not to exceed $2,500,000.00. Interest on the First Western LOC accrues at the rate of 5.5% per annum until paid in full.

19.     On October 4, 2017, Debtor as Borrower and First Western as Lender entered into a Promissory Note for $1,100,000 to purchase equipment (the "**Equipment Loan**"). Payments on the Equipment Loan are $15,842.77 due on the first business day of each month.

20.     As of the Petition Date, the Debtor has secured obligations owing to First Western in the following principal amounts:  $2,438,187.13 on the First Western LOC and $875,539.67 on the Equipment Loan for a total amount of $3,313,727 plus accrued and unpaid interest with respect thereto, fees, costs, and other expenses (the "**First Western Secured Debt**").  The Debtor has granted security interests in all or substantially all of its assets to secure its obligations under the First Western LOC and Equipment Loan (the "**First Western Prepetition Collateral**").

21.     First Western perfected its security interest in the First Western Prepetition Collateral by virtue of a UCC-1 financing statements filed with the North Dakota Secretary of State's Office on February 4, 2005 as Document No. 05-000229642-0 (continuations filed on 11/4/09 and 2/4/15) and on July 16, 2008 as Document No. 08-000474753-9 (continuations filed on 5/16/13 and 5/30/18).

22.     First Western also holds mortgages on real property located in Chouteau County, Montana owned by Justin & Melissa Flaten and Arrow Kay Farms Inc. The Justin & Melissa Flaten real property consists of 505 acres with an estimated value of $753,000 and a pre-existing mortgage against it of $76,000. First Western holds a mortgage against the Justin & Melissa Flaten real property with maximum lien of $2,500,000 dated May 14, 2019 and recorded in the Chouteau County Recorder's Office on June 6, 2019 as Document No. 475468.

23.     The Arrow Kay Farms, Inc. real estate consists of 840 acres with an estimated value of $1,199,000 with a pre-existing mortgage against it of approximately $289,000. First Western holds a mortgage against the Arrow Kay Farms, Inc. real property with maximum lien of $2,500,000 dated May 14, 2019 and recorded in the Chouteau County Recorder's Office on June 6, 2019 as Document No. 475469. These two mortgages have increased the value of First Western's collateral by $1,215,000 (*i.e.*, $574,000 for the Justin & Melissa Flaten real property and $641,000 for the Arrow Kay Farms, Inc. real property).

*(ii)     Receiptholders.*

24.     Debtor regularly purchases pulse crops from North Dakota and Montana farmers. As of the Petition Date, the Debtor has the following inventory from North Dakota and Montana farmers stored in the Garrison, ND and Cummings, ND warehouses and the toll processor facility located in Purdue, MT (the "**Receiptholders**"):

| Name | Location | Crop (cwts) | Value |
|---|---|---|---|
| Bryan Rustad | Garrison, ND | 82.59 Green peas | $1,087.12 |
| Ryan Weber | Garrison, ND | 545.80 Yellow peas | $3,944.13 |
| Steve Seidler | Garrison, ND | 485.95 Yellow peas | $4,020.76 |

8

| Finken Farms & Seeds LLP | Garrison, ND | 889.19<br>Yellow peas | $9,096.54 |
|---|---|---|---|
| Matt Fisher | Cummings, ND | 3,905.97<br>Chickpea peas | $61,612.26 |
| Larry A. Pease Estate | Garrison, ND | 2,652.52<br>Red lentils | $32,824.93 |
| James Walsh | Cummings, ND | 2,674.37<br>Small Green lentils | $37,066.77 |
| Don & Edith Bauman | Garrison, ND | 3,316.95<br>Green peas | $41,044.36 |
| Lyle Harris | Garrison, ND | 5,060.09<br>Red lentils | $62,618.67 |
| R&R Grain | Garrison, ND | 11,059.71<br>Yellow peas | $110,188.67 |
| Pondera Colony | Pardue, MT | 8,213.15<br>Medium green lentils | $97,572.21 |
| Black Leaf Farms, Inc. | Pardue, MT | 3,713.10<br>Chickpea peas | $148,728.14 |
| | | **Total:** | **$609,804.56** |

25.     Pursuant to N.D.C.C. § 60-02-25.1, a superpriority lien is granted in favor of receiptholders who store, sell, or deposit grain in warehouses located in North Dakota. The statute provides

> *Grain contained in a warehouse, including grain owned by the warehouseman, is subject to a first priority lien in favor of outstanding receiptholders storing, selling, or depositing grain in the warehouse. The lien created under this section shall be preferred to any lien or security interest in favor of any creditor of the warehouseman regardless of the time when the creditor's lien or security interest attached to the grain.* Notice of the lien created under this section need not be filed in order to perfect the lien. The lien created by this section is discharged as to grain sold by the warehouseman to a buyer in the ordinary course of business. Such sale does not discharge the lien in favor of an individual receiptholder in the remaining grain in the warehouse.

*See* N.D.C.C. § 60-02-25.1 (emphasis added); *see also In re Woods Farmers Co-op Elevator Co.*, 946 F.2d 1411 (8th Cir. 1991). Montana has an almost identical statute (MT St. 80-4-420).

       (iii)    *FBN Unsecured Debt*.

26.    The Debtor entered into a Master Purchase Agreement with FBN CM LLC ("**FBN**"), a Delaware limited liability company, on November 17, 2017, in which Debtor committed to purchase agricultural commodities (yellow peas, garbanzo beans, green lentils and other pulse crops) exclusively from FBN ("**FBN Goods**") for a period of two (2) years. Under the Master Purchase Agreement, the Debtor will purchase certain amounts of commodities from FBN and pay for the commodities and a 6% commission on each purchase within sixty (60) days of delivery of the FBN Goods.

27.    Debtor granted a security interest to FBN in the FBN Goods and any and all proceeds pursuant to the Master Purchase Agreement.

28.    FBN perfected its security interest in the FBN Goods and any and all proceeds by virtue of UCC-1 financing statements filed with the North Dakota Secretary of State's Office on August 16, 2018 as Document No. 18-000426692-0.  The UCC-1 financing statement indicates that FBN's collateral is:

> All of the Debtor's right, title, and interest in and to the following, wherever located, and now owned or hereafter acquired:   all yellow peas, garbanzo beans, green lentils and any  other pulse crops (including but not limited to green peas and red lentils) delivered by secured party to debtor pursuant to, and as more fully set forth in, the Master Purchase Agreement dated as of November 17, 2017 between the debtor and the secured party, together with any and all proceeds of the foregoing.

29.    As of the date hereof, FBN is owed approximately $863,330.04 plus accruing interest and fees.

30.     The Debtor does not have any remaining FBN Goods in its inventory and does not have any accounts receivables for FBN Goods. Accordingly, Debtor believes that FBN is an unsecured creditor.

(iv)     <u>*Secured Equipment Leases*</u>

31.     Debtor entered into an Equipment Lease Agreement ("**Forklift Lease**") with Toyota Industries Commercial Finance ("**Toyota**") on or about December 12, 2016 for the lease of a Toyota 8FGU25 Forklift, S/N 60503. The payments due under the lease are $748.01 per month for a term of sixty (60) months. Debtor has a purchase option at the end of the Forklift Lease to purchase the forklift for $1.00.

32.     Debtor entered into an Equipment Finance Agreement ("**Optical Sorter Lease**") with TCF Equipment Finance, a division of TCF National Bank ("**TCF**") on August 19, 2015 for the lease of a 2015 Sortex optical sorter, Model A3-BRBBL, S/N 700028626 together with all attachments and accessories thereto. The payments due under the lease are $5,003.46 for a term of sixty (60) months. Debtor has a purchase option at the end of the Optical Sorter Lease to purchase the optical sorter for $1.00. TCF filed a UCC-1 financing statement with the North Dakota Secretary of State's Office on August 26, 2015 as Document No. 15-001003331-8.

(v)     <u>*Other Unsecured Debt*</u>

33.     As of the Petition Date, the Debtor's books and records reflected accounts payable due and owing in an amount exceeding $1,307,606 on account of unsecured debt, including amounts owed to the Debtor's trade creditors (exclusive of amounts owing to FBN and the Receiptholders).

11

### III.    <u>OBJECTIVES FOR CHAPTER 11 AND PROPOSED INITIATIVES</u>

34.    For the reasons outlined above, the Debtor believes that the commencement of this Chapter 11 case is a necessary and prudent measure to maximize the value of the Debtor's estate. The Debtor will take—and in some instances already has taken—a number of steps to reduce its expenses, such as filing appropriate contract and lease rejection motions, pursuant to which the Debtor will seek to reject a number of burdensome contracts that the Debtor has determined are unlikely to be assumed and assigned and will, in the near term, be no longer necessary to the Debtor's operations.

### IV.    <u>FIRST DAY MOTIONS</u>

35.    As a result of my first-hand knowledge, and through my review of various materials and information and discussions with members of the Debtor's management, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in the First Day Motions, (b) the need for the Debtor to continue to operate effectively, (c) the deleterious effects upon the Debtor of not obtaining the relief sought in the First Day Motions, and (d) the immediate and irreparable harm to which the Debtor will be exposed upon the commencement of this Chapter 11 case unless the relief requested in the First Day Motions is granted without further delay.

36.    I submit this Declaration in support of the Debtor's Chapter 11 petition and First Day Motions. I or members of the Debtor's management team participated in preparing and/or have reviewed each First Day Motion (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtor's operations

and financial condition, and information provided to me by the Debtor's management team or advisors on which I reasonably relied.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each First Day Motion and this Declaration.

37.     I believe, on behalf of the Debtor, that the relief sought in the First Day Motions will minimize the adverse effects of this Chapter 11 case on the Debtor, its employees and its creditors, and help ensure that the value of the Debtor's assets are maximized for the benefit of all interested parties.  As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtor, in consultation with its professionals, to ensure that the Debtor's immediate operational needs are met, and that the Debtor suffers no immediate and irreparable harm during the restructuring process.  I, or my colleagues at my instruction, participated in the analysis that informed each First Day Motion, and assisted in developing the relief requested therein and reviewing pleadings related thereto.  At all times, the Debtor's management and professionals remained cognizant of the limitations imposed on a debtor-in-possession and, in light of those limitations, the Debtor narrowed the relief requested at the outset of this Chapter 11 case to those matters that require urgent relief to sustain the Debtor's immediate operations and preserve value during the pendency of this Chapter 11 case.

### A.     *Utilities Motion*

38.     By this motion (the "**Utility Motion**"), the Debtor seeks to ensure continued provision of utility services (the "**Utility Services**") to both of the Debtor's locations.  The Debtor seeks the entry of interim and final orders (i) prohibiting the Debtor's utility service providers (collectively, the "**Utility Service Providers**") from altering, refusing, or

discontinuing utility service on account of unpaid prepetition invoices, (ii) deeming the Utility Service Providers to be adequately assured of future payment, and (iii) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtor to provide adequate assurance of future payment to the Utility Service Providers.  The Debtor proposes establishing a segregated account into which the Debtor will deposit a sum equal to approximately 50% of the Debtor's estimated aggregate monthly utility expenses and, additionally, have proposed procedures to address any request made by the Utility Service Providers for additional adequate assurance.

39.     Any disruption of the Debtor's Utility Services would cause irreparable harm to the Debtor's business operations and its estate. A successful restructuring requires that the Utility Services be provided on a continual and uninterrupted basis while the Debtor remains in its processing locations.  Any disruption of the Utility Services could have a significant impact on the Debtor's business operations and efforts to maximize value for the estate.

40.     For the foregoing reasons, the Debtor submits, and I believe, that the relief requested in the Utility Motion is in the best interest of the Debtor, its estate and its creditors, and should therefore be approved.

### B.     *Insurance Motion*

41.     By this motion (the "**Insurance Motion**"), the Debtor requests the entry of an order (i) authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, renew or perform under renewed insurance programs (collectively, the "**Insurance Programs**") summarized in the Insurance Motion, and (b) pay, in its sole discretion, all undisputed policy premiums, claims, deductibles, retentions, administrative fees, broker fees and other obligations relating to the Insurance Programs (such obligations, the "**Insurance**

**Obligations**") that were or are due and payable, and relate to the period before or after the Petition Date, and (ii) authorizing the Debtor's banks (the "**Banks**") to honor and process check and electronic transfer requests related thereto.

42.     In the ordinary course of business, the Debtor has maintained, and continues to maintain, insurance coverage for, among other things, (a) general liability, (b) auto, and (c) umbrella.

43.     I believe that maintaining the Debtor's insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transactions, and necessary to preserve value of the bankruptcy estate's assets during the Debtor's restructuring.  Authority to pay any prepetition Insurance Obligations—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided under the Insurance Programs—is imperative, as the insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtor's assets, and, in most cases, such coverage is required by the various contracts and laws that govern the Debtor's operations.  Furthermore, it is my understanding that, under the Chapter 11 operating guidelines issued by the United States Trustee for Region 12 pursuant to 28 U.S.C. § 586, the Debtor is obligated to maintain certain insurance coverage during this Chapter 11 case, and such coverage is provided by certain of the policies included in the Insurance Programs.

44.     Accordingly, for the reasons set forth herein and in the Insurance Motion, the Debtor respectfully requests that the relief requested in the Insurance Motion be approved.

### C.    *Wages Motion*

45.    Pursuant to this motion (the "**Wages Motion**"), the Debtor requests entry of an order (a) authorizing, but not directing, the Debtor in accordance with its stated policies and in its discretion, to, among other things, (i) pay prepetition employee wages, salaries and other accrued compensation, (ii) reimburse prepetition employee business expenses, (iii) make contributions to prepetition benefit programs and continue such programs in the ordinary course of business, (iv) honor workers' compensation obligations, as applicable, (v) make payments for which prepetition payroll deductions were made, (vi) pay processing costs and administrative expenses relating to the foregoing payments and contributions, and (vii) make payments to third parties incident to the foregoing payments and contributions; and (b) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing.

46.    As of the Petition Date, the Debtor employs ten (10) Full-Time Employees Although the Debtor has paid its wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for remaining Employees may nevertheless be due and owing.

47.    Many of the Debtor's Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these employees will be exposed to significant financial hardship if the Debtor is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtor is unable to satisfy such obligations, employee morale and loyalty will be jeopardized at a time when employee support is critical to the Debtor and the success of the Debtor's restructuring efforts. If the Debtor's Employees are inclined to find alternative

employment, the Debtor would need to replace such employees to conduct the Debtor's business, at a substantial cost to the Debtor.

48.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption to conduct an orderly restructuring.  Accordingly, the Debtor respectfully request that the relief set forth in the Wages Motion be approved.

### D.    *Cash Collateral Motion*

49.    As more fully described in the motion seeking authority to use cash collateral filed contemporaneously herewith (the "**Cash Collateral Motion**"), the Debtor requests entry of an order (a) authorizing the Debtors to use cash collateral ("**Cash Collateral**"); (b) granting adequate protection to First Western (if necessary) and the Receiptholders; (c) modifying the automatic stay, to the extent applicable and as set forth in the Cash Collateral Motion; and (d) granting certain related relief.

50.    I believe that the Debtor has an immediate need to use Cash Collateral, without which the Debtor cannot, among other things, operate its processing locations, or fund payroll. Otherwise stated, access to Cash Collateral is a critical component of the Debtor's restructuring strategy.  Cash Collateral, preferably used on a consensual basis, will give the Debtor sufficient liquidity to administer this case and move forward with its restructuring efforts.

51.    For the foregoing reasons, and those set forth in the Cash Collateral Motion, the Debtor respectfully requests that the Cash Collateral Motion be granted.

## V.    CONCLUSION

52.    In conclusion, for the reasons stated herein and in each of the First Day Motions

filed concurrently or in connection with the commencement of this Chapter 11 case, the Debtor

respectfully requests that each First Day Motion be granted in its entirety, together with such

other and further relief as the Court deems just and proper.

53.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct to the best of my knowledge, information, and belief.

Dated this ⟨25⟩ day of June, 2019.

                                               _____

                                               Justin Flaten, President

18

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| In Re: | Case No.:  19-30359 |
|---|---|
| JM Grain, Inc., | Chapter 11 |
| Debtor. | |

**CERTIFICATE OF SERVICE**

I, Jill Nona, declare under penalty of perjury that on June 25, 2019, the following documents were served either electronically via CM/ECF or by US Mail at the indicated address:

**DECLARATION OF JUSTIN FLATEN IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

| **Debtor** | JM Grain, Inc. | PO Box 248<br>Garrison, ND  58540 |
|---|---|---|
| **Attorneys for Debtor** | Caren W. Stanley | cstanley@vogellaw.com |
| | Jon R. Brakke | jbrakke@vogellaw.com |
| **U.S. Trustee** | Office of the U.S. Trustee Region 12 | 300 South Fourth St, Suite 1015<br>Minneapolis, MN  55415 |
| **Secured Creditors (First Western Bank and Receiptholders)** | First Western Bank & Trust | P. O. Box 1090<br>900 South Broadway<br>Minot, ND 58702<br>Fax: 701-857-7143 |
| *North Dakota Farmers:* | Bryan Rustad | 1823 50th Ave NW<br>Garrison, ND 58540 |
| | Don & Edith Bauman | 2592 61st Ave NW<br>Ryder, ND  58779 |
| | Finken Farms & Seeds LLP | 16300-359th Ave SW<br>Douglas, ND  58735 |
| | James Walsh | 2800 42nd St NE<br>Minot, ND  58703 |
| | Larry A. Pease Estate Harvey Huber | 680 48.5 Ave NW<br>Hazen, ND  58545 |

|  | Lyle Harris | 8525 Sleepy Hollow Lane<br>Elk Grove, CA  95757 |
|---|---|---|
|  | Matt Fisher | 825 2nd Ave NW<br>Mercer, ND  58559 |
|  | R&R Grain | 110 Main Ave North<br>Regent, ND  58650 |
|  | Ryan Weber | 2241 29th Ave SW<br>Center, ND  58530 |
|  | Steve Seidler | 1760 34th Ave NW<br>Garrison, ND  58540 |
| *Montana Farmers:* | Black Leaf Farms, Inc. | 5130 US Highway 89<br>Choteau, MT  59422 |
|  | Pondera Colony | 300 Pondera Colony Rd<br>Valier, MT  59486 |
| **Twenty Largest Unsecured Creditors** | AGT Foods | 1611 E. Century Ave., Suite 102<br>Bismarck, ND  58503-0780 |
|  | American Express | PO Box 650448<br>Dallas, TX  75265-0448 |
|  | BNSF Railway Company | 3110 Solutions Center<br>Chicago, IL  60677-3001 |
|  | Buhler Inc. | 28064 Network Place<br>Chicago, IL  60673-1280 |
|  | Canadian Pacific Railway Co.<br>SOO Line Railroad Company | 8290 Collection Center Dr.<br>Chicago, IL  60693-0082 |
|  | Central Bag Company | PO Box 37<br>Lansings, KS  66043 |
|  | Commercial Lynks Inc. | 4709B Eisenhower Ave.<br>Alexandria, VA  22304 |
|  | Cummings Ag Inc. | PO Box 152<br>Buxton, ND  58218 |
|  | Dahl Trucking LLC | 9240 HWY 1 South<br>Langdon, ND  58249 |
|  | FBN CM LLC | 1627 W. Main<br>Bozeman, MT  59715 |
|  | FreightQuote | PO Box 9121<br>Minneapolis, MN  55480-9121 |
|  | Jacintoport International LP<br>Dept. 1201 | PO Box 121201<br>Dallas, TX  75312-1201 |
|  | Koelnmesse GmbH | Messepl. 1,<br>Köln 50679<br>GERMANY |
|  | Minot Grain Inspection, Inc. | PO Drawer B<br>Minot, ND  58702-0210 |

2

|  |  |  |
|---|---|---|
|  | Pardue Grain<br>Roger Samons | 64 Pardue Road<br>Cut Bank, MT  59427 |
|  | Rademacher Trucking Inc.<br>Kevin Rademacher-MC 281148 | 5767 N. 17th Ave.<br>Norwich, ND  58768 |
|  | Ray-Mont Logistics America Inc. | 1751 Richardson, Suite 4.500<br>Montreal, QC H3K 1G6<br>CANADA |
|  | Safflower Technologies International | PO Box 907<br>112 S 1st Ave #3A<br>Laurel, MT  59044 |
|  | Trinity Logistics | PO Box 62702<br>Baltimore, MD  21264 |
|  | Union Pacific Railroad Company | PO Box 502453<br>Saint Louis, MO  63150-2453 |
| **Utility Vendors** | City of Garrison | P.O. Box 459<br>Garrison, ND  58540-0459 |
|  | Otter Tail Power Company | P.O. Box 2002<br>Fergus Falls, MN  56538-2002 |
|  | Reservation Telephone Cooperation | P.O. Box 66<br>Parshall, ND  58770 |
|  | Spectrum Business | P.O. Box 742614<br>Cincinnati, OH  45274-2614 |
|  | Verizon Wireless | P.O. Box 25505<br>Lehigh Valley, PA  18002-5505 |
|  | Waste Management | P.O. Box 42390<br>Phoenix, AZ  85080 |
| **Insurance Providers** | Continental Western Group | 11201 Douglas Ave.<br>PO Box 1594<br>Des Moines, IA  50306 |
|  | United States Fire Insurance Company | 1210 Office Plaza Drive<br>West Des Moines, IA  50266 |
| **Broker** | American Insurance Center | 604 College Dr S<br>Devils Lake, ND  58301 |

Dated this 25th day of June, 2019

*/s/ Jill Nona*
Jill Nona

STATE OF NORTH DAKOTA          )
                               )  SS
COUNTY OF CASS                 )


Subscribed and sworn to before me this 25th day of June, 2019.

*/s/ Katherine Johnson*
Notary Public
State of North Dakota
My Commission Expires: April 17, 2022